Hello. David Merchant again on behalf of Ms. Schreiber. I did author the brief in this case, although I did not do the trial. And again, I am from the Federal Defenders of Montana. I guess to be as candid with the Court as possible, I think Mr. Archer is right. I think a reasonable finder of fact probably could have found Ms. Schreiber guilty. But why did anybody bring this prosecution? I'm sorry? But why did anybody bring this prosecution? That's essentially what you're saying. Right. But of course, that's really beyond your jurisdiction to worry about, and it's beyond our jurisdiction to worry about, too. Correct. But I think in arguing the sufficiency of the evidence, it really plays into what I think is actually right. Normally, I stand up and concede the fact that ineffective assistance to counsel is not for a direct appeal. But in this case, there were so many errors that occurred. But there's so many things we don't know. I mean, we don't know, for example, if the attorney might have tried to find good witnesses, and maybe they were adverse to her. Or we just don't know what went into the strategy not to try to put on another expert. Maybe he considered that. Maybe other experts said, I've looked at this file, and there's nothing to it. How can we know any of that without a factual finding? Well, when we start at the beginning, from 1987 until 2006, the government would agree that she is disabled, that she is permanently disabled, or totally disabled, and that she can't work. And during that time, I think she sees something like 26 different doctors along the way. But the question is whether she was disabled from the injuries she suffered in the post office. Absolutely. Right. So what happens is trial counsel then files a motion to exclude all of that information and just focus on 2006 to 2008, in which they have videotape that basically shows that she can do certain things, in which she then goes and reports to the agency that's investigating it that she can't do anything. So from the onset, the trial counsel tried to exclude all the good stuff. And if the fact that he couldn't bring in any of those doctors and say, you know what, I did a physical examination, this is the problem, and there's nothing in front of me except this video that shows anything different. In fact, the doctor said, you know, I see the video, and she probably isn't being as completely candid as possible, but I'd want to do a physical examination. That's what that doctor says. He didn't send her to a doctor. He didn't do any of those things. The fact is he tried, and it still befuddles me that he tried to enter X-rays that are absolutely useless for a defendant. She was going to be the person to enter them. They were absolutely useless. And Judge Siebel did a marvelous job of saying they might have relevance if some doctor were here to do that. When I was reviewing this case, it's easy to Monday morning quarterback somebody else's trial. It's even easier because I had tried this almost identical set of facts six months prior with the exact same agents, and the trial counsel for the government that I tried it with was sitting second chair. The mere fact that you have a subjective issue of pain, this person says they are in pain and they are unable to do that, and they don't present a doctor fails from the very onset of this. And you can also, Monday morning quarterback, the back end of it. What happens after Ms. Schreiber is convicted is that she goes so completely sideways that Judge Siebel said, we've got a problem here, and sends her for the 30-day eval. And if you look at the record for that, the 30-day eval, they didn't even get there. They said she has problems, and they kept her. They do the hearing, the four. She is not going to be incarcerated anymore. She's satisfied her time during her incarceration in the psychiatric ward. Unless she violates herself. Unless she violates herself, right. As things now stand with the record before us, she is not in prison anymore. She's satisfied that. She is. And so in terms of the delay for getting evidence of whether her counsel was ineffective or not, that won't be time that she will be spending incarcerated, presumably, unless she violates probation. But that's beyond our control. That's her control. Usually our attitude is that if you violate conditions of supervised release, that's your problem. I agree with you. Yes, that's true. But she does have a federal felony conviction, so she is preempted from receiving the disability. And I don't think anybody says, and I don't even think the government at this point would say that she is totally restored and she should be back to work 100%. There is still a disability there, but even more so. And I think the record is replete with this. This is a woman who barely scrapes by. This is a woman who, when the government buys the house next to hers so that they can surreptitiously videotape her, they also throw out some bait. They throw out some wood because this is a woman who can't afford to heat her house. So she has to go out and struggle with this wood. That's no different than the story about the government agent that comes in and offers to buy drugs from someone, too. They throw out bait also, that is money, to buy these drugs. That's a similar analogy. All of that has got some clear downsides to it, but the law is that it's okay. Right. The other problem with her conviction, obviously is that the government agent can't afford to heat her house. Now, to go to your particular argument, I don't understand how we can possibly do anything with ineffective assistance without knowing what the doctor, just a minute, without knowing what the doctor would say. Because, I mean, even if we all agree there should have been a doctor, we can't even agree there should have been a doctor unless we know what the doctor would say. Because if you have, unless we have a record of a doctor who would say, I would have looked at this record and I would have said that she is totally disabled, then we can't decide either that she should have been on, should have been put on, or more obviously that there was any prejudice involved. You're right, and that's my problem. I can't prove a negative. I can't, I can argue until I am blue in the face that I do not have a Ronald McDonald suit at home in my closet that I wear every Thursday night. I can't prove that to you. I can tell you I don't. But that doesn't prove anything. But here's the problem. But what I'm saying is if you did it on a 2255, you would have a doctor, if you could find one, who would say something helpful, in which case you would then be able to demonstrate that if they had put on a doctor, the doctor would have been helpful. But without that, I don't, leaving aside the question of why a doctor was or wasn't put on, push that off the side now. Even so, you still need to know what the doctor was saying in order to figure out whether there would be a 2255 here at all. You are right. And therefore, don't you lose and don't you go off tomorrow and bring your 2255, if you could find a doctor. No, because there isn't an attorney in this room who would tell you that they'd have proceeded to this trial without a doctor. I know, and I say assume you're right. We still can't make a judgment about whether it would have made any difference to have the doctor, and therefore we can't decide whether or not the judgment, the conviction should be reversed because we don't know what the doctor would say. Except that we had literally dozens of doctors before who said that she was disabled. But most, many of them, I don't know about the dozens, but the several critical ones, they said, and Dr. Dennis, particularly the main doctor, said that he basically relied on what she said. Doesn't she have responsibility for being honest with the doctor about all these recreational activities that she can engage in? No, I believe he did say that he conducted tests, that there were some range motions. He also said that much of what my conclusions were because of her representations, that had I known the truth of all these other things that she could have done, I would have come out differently. So he was basically saying she concealed from me important material. Doesn't she have some responsibility for that? She does. Didn't she? This is one thing I didn't understand about the record. She actually told the government in her submissions that she was doing hunting and fishing. She did. She did admit to hunting, fishing. She admitted to riding on snowmobiles. She admitted to riding on an RV. She admitted that she moved things up to 20 pounds. She said all of those things. And one of the problems I think comes is that, and through the record, there is some argument to the court or to the jury that you have good days and you have bad days. And the government responded, I think appropriately, saying, Well, we have these three days in a row where she did a fair amount of work on day one, did a whole lot of work on day two, and on day three we don't see anything that's bad. And they put together a best of video. They put together this 58-minute video that had snippets of that. Well, there were 19 hours of video. There were other time periods of that day where she actually is grabbing at her side, grimacing, sitting down. She's doing those things. And that wasn't shown to the jury. However, stuff that's pretty tough that makes it difficult for me as to what you do as regards to bringing in a doctor is that she was offered a limited-duty job. She was not offered a limited-duty job after 2006. And seeing telephones two days a week, as I understand it, using a headset. That was prior to 2006. Thousand years, years, many years. I understand. I understand. But I'm just suggesting in this particular situation gives me some idea myself that somebody ought to have a doctor. Because the government, as I understood their general idea, is she could come to work for less time than full time. She could do whatever she needed to do during that time. All we were trying to do, all the government was trying to do is get her back to work. Sometimes, some way to give her some compensation. I don't disagree with you. And, therefore, it still seems to me that my colleague's questions are pretty straight. We can't just assume based on what was in medical records prior that she can do what they suggest or can't do what they suggest they're offering her to do. I see my time running. Can I respond to that question? Please do. I agree with everything you've just said. And I'd like to add that up to 2006, even the government says we believe that she's totally disabled at that point. So even they're offering her this job, the doctors are saying, no, she can't go back. We're assuming she's abiding by what the doctors are saying. And after 2006 to 2008, when this case rushed, there is no offer of a lesser job. And there's no physical examination of her done by anybody. Did the government put on any medical evidence of anybody who had examined her during the relevant time period? No. Thank you very much. We'll give you a minute of rebuttal again. May it please the Court. My name is Ryan Archer. I'm an assistant United States attorney from Billings, Montana, representing the United States. I give kudos to Mr. Merchant for saying that a reasonable juror could find the defendant, Ms. Shriver, guilty in this case. I think the most powerful evidence in this case was the video evidence. We submitted snippets of that as an exhibit, and I hope you were able to review that. But what about the rest of that? Did the defense have the opportunity to submit the rest of that video if they wished? Yes, Your Honor. In fact, how it worked in trial was the entire 19 hours of video was introduced as an exhibit. So, in fact, the jury could have watched the entire 19 hours, but only summary portions of that video was played during trial to not belabor the issue. The judge probably would have thrown me out of his courtroom if I attempted to play 19 hours of video. So we did take a representative sample, and, in fact, we played some of the video. Actually, all of the portions of the video where Ms. Shriver showed indications of some type of pain, which was a stretching of the back, basically, and then she would continue to work. So we did play the bad along with the good. And all of that video was in evidence. The defense at any point in time could have played. The thing is, in the pre-sentence report, there's a list of the medical procedures this woman had between 1970 and 2008. It doesn't look like she has a bone left in her body. I mean, in terms of – I've never seen anything like this in terms of the various ways in which her bones and every part of her body were fused and put screws and put metal plates and things taken out and towels taken off and so on and so on. I mean, she obviously had major, major problems. Your Honor, she did have issues. No, huge issues. Well, she did have huge medical issues, but a lot of those surgeries were related to rheumatoid arthritis, which, of course, would not qualify her for workers' compensation. And how this investigation came about, essentially, there were allegations over a decade before the actual surveillance was undertaken. After her last back surgery in 1997, there had been allegations all along where neighbors were seeing her do activities. But, frankly, she lived in rural Montana in a town of 12 people, and it was hard to go in and see what she was actually doing. And there was the one instance where she actually told her neighbor, if anybody comes asking, don't tell the postal agents what you see me doing. And that individual testified at trial, and he said, well, I'm not going to lie for anybody. So there had been allegations that she was capable of doing some type of work for quite a while before the investigation occurred. And her certifications on her Form 1032 certified that she was totally disabled. Yes, Your Honor. Completely, 100 percent, totally disabled. And she was told that if she – that she should know that if she were making false statements to the government, that could be a criminal offense. Yes, Your Honor. Why – I'm just sort of interested to know why the usual remedy for this isn't to cut off the benefits. Why are we going through these – I gather it's been more than one of these prosecutions. Yes, Your Honor. You obviously spent more money prosecuting her than you were losing. Your Honor, and I will be frank with you. I'm appalled that the benefits were not cut off. In fact, she was still receiving benefits while we were engaged in a criminal trial. And to put – and not only that, if you just cut off benefits when you could and not – don't put people in prison, which doesn't – I mean, which in this instance was a total disaster, apparently, in terms of how it affected her. It just doesn't seem like the way the government should be proceeding. If it doesn't take the remedies it does have and instead takes draconian, somewhat useless, and incredibly expensive ones, why are we doing this? Well, Your Honor, part of it is the Department of Labor's decision. And so that's outside of my control. What the U.S. Attorney's Office looks at in charging a case like this is the facts of the case. In this case, we gave her every opportunity to come in and admit that she could work.  That was in 2000. That was in 2000. And about when you started all this, did anybody go in then and say, here's a job for you? Yes, Your Honor. In fact, one month after the surveillance, we did the undercover interview. The undercover interview, the agent went in there and gave Ms. Shriver the opportunity. She says, are you interested in vocational rehabilitation, which means that she can engage in programs provided by the government to do something different, to get back to work. The government had obviously made it clear that she could come back to work for two hours a day and still receive her full-time benefits. And that interview that ---- In 2006 they made that clear? In the interview that occurred in December of 2006, which was one month after the surveillance. Oh, that she could come back to work for two hours a day. Well, they said, look, can you come back to work? All we want to do, you can do vocational rehabilitation, you can do some type of reduced labor, you can do ---- Did anybody tell her in 2008 that you could have that job we told you about in 2000? No, they didn't say that specific job. But they said, can you do anything for us? We'll put you in programs, we'll accommodate whatever disability you may have. And Ms. Shriver said, I quote, I would rather throw a damn plastic tray down someone's throat than come back to work for the Postal Service. Well, and she also said that she could not work. She says, I can't stand, I can't work, I can't do anything. Yes, yes, Your Honor. In that interview, she said that she was completely disabled. To her, the pain is piqued right now. Did anybody say to her at that point, well, that's funny, we've seen you do X, Y, and Z? In fact, the agent came back and said, well, it says here on your form that you do some hunting and you do some snowmobiling. Did anybody say we have surveillance pictures of you doing X, Y, and Z? They did not confront her with the surveillance video at that point. And essentially, while she did admit to some things, as I argued to the jury, this was... So this wasn't an interview that was really intended to resolve the problem by getting her back to work. It was really resolved to prove that she was lying. It was giving her an opportunity to come forth with what she could truly do. And that's what it was. She had every opportunity after the investigation to come in. And if she had... We see ERISA cases and social security cases, but more ERISA cases where private companies, they'll do interview things like surveillance like this, and then they'll write people and say, we did the surveillance, this is what we saw, you're not entitled to benefits anymore. If you don't think so, come back and tell us why. Which is, you know, that's the... But that was never done here. Nobody ever said to her, this is what we know, and we think you're not entitled to benefits, and why don't you go back to work? Nobody ever did that. Your Honor, at that point in time, it was an undercover criminal investigation. Exactly. It was a criminal investigation. It wasn't an attempt to get her back to work. Well, Dorothy Mueller testified at trial, and she's a vocational rehabilitation specialist with the Postal Service. She testified that on numerous occasions she tried to get her back to work throughout the years, and that every time she would try to get her back to work, that Bonnie Schreiber would just say she couldn't do it, she didn't have the physical capability. During this time period? Because, I mean, it seems plain that she was really very disabled up to some point. At what point, we don't know. But up to some point. Up to some point, she was disabled. She got better. And she didn't tell anybody about it. And she was warned under penalty of perjury and prosecution that she had to tell someone that she was capable of working. Dorothy Mueller, you know, in the 2000s, tried to get her back to work with the Postal Service, taking administrative actions. She testified to that fact, and she testified that Bonnie Schreiber refused. And then even in 2006, in the undercover interview, she could, if she had come in and said I can work a couple hours a day, we wouldn't be here today. Okay. Well, you can keep going. You have another minute and a half. Well, just briefly, to address your question as to whether the government ever called a treating physician at the time of the alleged offense. You'll see in the record, we had intended to call her current treating physician, who would have testified in our favor. And that's at excerpt of record, page 486. What happened, it's not a public record now, but our office had a conflict with him. He was actually prosecuted for writing false prescriptions by our office. And that investigation came about at the exact point in time of this trial. And so that's why we were not able to call her current treating physician. But in the record, we had to. So you had the ability all during this period, as I understand it, to send her to government chosen doctors, right? And that was never done, was it? What was never done? Sending her for a medical exam for a doctor of your choice, the government's choice. Of our choice? Yes. It had been done back in the 1990s. Right. But it wasn't done over this period. It wasn't done over this period. That's also kind of strange. But was it really that you could send her to your doctors, or was it that she had to go see a doctor, and he had to fill out the report? That's what it was, Your Honor. I thought you mean you couldn't just send her for a medical report for somebody you chose? We could choose different doctors, but there were doctors that in the Billings area were basically authorized to do these kind of things. Right. In other words, a government-selected doctor. Yes. But you didn't do that? We didn't send her to a specialist in the 2000s. In the 1998, I believe, we had. So presumably you agreed with her, or it wouldn't have gone on. Yeah, Your Honor, there's a very extensive record of what occurred. There were some disputes, but ultimately Ms. Schreiber came back with continued complaints of pain and stayed on workers' compensation. Okay. Thank you very much. Thank you. You can have a minute rebuttal if you want to. No? No. Okay. Thank you very much. The case of United States v. Schreiber is submitted. We'll go on to United States v. Has the Eagle, Sr. Thank you.
judges: Ebel, Berzon, Smith